USCA1 Opinion

 

 ____________________ No. 96-1812 ROBIN CLIFTON and MAINE RIGHT TO LIFE COMMITTEE, INC., Plaintiffs, Appellees, v. FEDERAL ELECTION COMMISSION, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. D. Brock Hornby, U.S. District Judge] ____________________ Before Selya, Circuit Judge, Bownes, Senior Circuit Judge, and Boudin, Circuit Judge. ____________________ David Kolker, with whom Lawrence M. Noble and Richard B. Bader were on brief, for appellant. James Bopp, Jr., with whom Paul R. Scholle, Bopp, Coleson & Bostrom, Daniel M. Snow, and Pierce Atwood were on brief, for appellees. ____________________ June 6, 1997 ____________________ BOUDIN,  Circu it Judge. The plaintiff Maine Right to Life Committee ("Maine Committee") brought this action in the district  court to challenge the validity of new regulations of the  Federal  Election Commission ("FEC"). The Maine Committee is a nonprofit membership corporation, exempt under the Internal Revenue Code, which engages in various activities in opposition to abortion. It accepts donations from other corporations for its general fund. Among its activities thus funded is the publication of voter guides describing the position of congressional candidates on "pro-life" issues and the publication of congressional voting records on the same issues. Its co- plaintiff Robin Clifton is a recipient and reader of these publications. The FEC regulations, effective March 13, 1996, purport  to  regulate voter guides and voting records in several different respects pertinent here. Voting  records. The new FEC regulation on voting records not only prohibits corporations and unions from expressly advocating the election or defeat of particular identified candidates--a  restriction not challenged by the plaintiffs--but also provides that even without such advocacy "[t]he decision on  content  and the distribution of voting records shall not be coordinated with any candidate, group of candidates or political  party." 11 C.F.R. S 114.4(c)(4). "Coordination" is not defined. -2- -2- Voter guides. Along with the restriction on express advocacy, the regulation on voter guides provides that either a  corporation or union publishing a guide must have no contact at  all  with  any candidate or political committee regarding the preparation, contents and distribution of the voter guide or, if there is such contact, (1) it must be only through written questions and written responses, (2) each candidate must be given  the  same  prominence and space in the guide, and (3) there must  be  no  "electioneering message" conveyed by any scoring or rating system used, or otherwise. 11 C.F.R. S 114.4(c)(5). The  district  court granted a declaratory judgment holding the regulations just described, apart from the ban on express advocacy, "invalid as not authorized" by the Federal Election Campaign Act of 1971, 2 U.S.C. S 431 et seq. ("the Act"), "because they restrict issue advocacy in connection with expenditures." Clifton v. FEC, 927 F. Supp. 493, 500 (D. Me. 1996). Some of the district court's reasoning is directed to the  statute,  and some to a right of corporate "issue advocacy" set  forth  in  FEC v. Massachusetts Citizens for Life, Inc., 479 U.S. 238 (1986). We  begin  with the statute, partly because of the district court's reliance on it and partly because of the general precept against deciding constitutional issues unless necessary. The provision of the Act on which the FEC relies for authority is 2 U.S.C. S 441b. In pertinent part it -3- -3- prohibits  any corporation or union from making "a contribution or  expenditure in connection with any" federal presidential or congressional  election  or primary. The Act does permit limited activities of this kind from "segregated" funds that are heavily regulated and are typically known as political action committees (PACs). See Massachusetts Citizens, 479 U.S. at 253-54. In Massachusetts Citizens, the Supreme Court held that section 441b prohibits corporate and union contributions but, as  to  expenditures  other  than contributions, the Court narrowly construed  the  statutory  ban as limited to "express advocacy" of the election or defeat of a candidate. Id. at 249. Thus, as glossed by the Supreme Court to avoid "overbreadth," id. at 248,  the  statute does not prevent corporations and unions from engaging  in  issue  advocacy including publication of the records and positions of federal election candidates. Previously, the FEC adopted a regulation under the same section that required voter guides to be "nonpartisan": they could  describe the candidates' positions but could not express the  organization's  opinion on the issues presented. This court held  the  new  limitation to be a straightforward restriction on issue  advocacy  and  therefore beyond the scope of the statute as construed  by  the Supreme Court. Faucher v. FEC, 928 F.2d 468, 471 (1st Cir.), cert. denied, 502 U.S. 820 (1991). -4- -4- In  response  to  Faucher ,  the FEC has issued the voter guide regulation at issue in the present case and has chosen a different tack. Instead of claiming any direct authority to regulate issue advocacy--a claim rejected by Massachusetts Citizens and Faucher--the FEC defends its new regulations as defining,  or  at least enforcing, section 441b's prohibition on contributions . It reasons that a voting record or voter guide publication  that fails to comply with its regulation is either a  contribution or can be banned in the interests of preventing prohibited contributions. The claim that noncomplying publications are therefore contributions is untenable. The Supreme Court has said, in discussing related statutory provisions, that expenditures directed by or "coordinated" with the candidate could be treated  as  contributions, see Buckley v. Valeo, 424 U.S. 1, 46 (1976);  but  "coordination" in this context implied some measure of  collaboration  beyond  a mere inquiry as to the position taken by a candidate on an issue. Id. at 46-47 & n.53; see also Colorado Republican Fed. Campaign Comm. v. FEC, 116 S. Ct. 2309, 2319 (1996) (opinion of Breyer, J.). On its face, the FEC's voter guide regulation bars non- written contact not merely regarding the preparation and distribution of voter guides, but also regarding their contents. 11 C.F.R. S 114.4(c)(5)(i), (ii)(A). Thus, the regulation expressly prohibits a simple oral inquiry by the -5- -5- Maine  Committee as to a candidate's position; and the district court  tells  us  that  the  FEC's counsel admitted at oral argument that  the  FEC  similarly interprets its ban on "coordination" of voting  record publications. 927 F. Supp. at 498. The FEC can construe terms but it cannot rewrite the dictionary and classify  a  simple  inquiry as a contribution. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 198-99 (1976); cf. Colorado Republican, 116 S. Ct. at 2319, 2321-22 (opinions of Breyer, J., and Kennedy, J.). But  if  ordinary  standards of agency power are applied, the FEC has a stronger claim--constitutional limitations aside-- that it can on prophylactic grounds ban oral contacts for voting records and voter guides, and perhaps require similar amounts of coverage of candidates in voter guides. True, not all oral contacts or different allocations of space will involve collaboration with the candidate. But some will, and the  FEC's  restrictions may reduce the risk of collaboration by making  it  easier to detect and less effective where it occurs. Normally  an  agency with rulemaking power has a measure of latitude where it is dealing with the regulated entity (here, corporations and unions) and where the rule is reasonably designed to achieve the statute's goal (here, to prohibit certain types of contributions). The FEC has such rulemaking power. 2 U.S.C. S 437d(a)(8); Buckley, 424 U.S. at 110. Agencies often are allowed through rulemaking to regulate -6- -6- beyond the express substantive directives of the statute, so long as the statute is not contradicted. See Mourning v. Family  Publications Serv., 411 U.S. 356, 369-71 (1973); United States  v.  Sou thwestern Cable Co., 392 U.S. 157, 177-78 (1968); Alexander v. Trustees of Boston Univ., 766 F.2d 630, 636-38 (1st Cir. 1985). We think it is thus not altogether easy to avoid approaching the question whether what the FEC is doing is constitutional. True, one could say that it is regulating issue advocacy while claiming to regulate contributions. But in a sense the FEC is doing both at the same time; and the statute,  it  should be noted, does not itself forbid reasonable regulation of contributions that happens also to burden issue advocacy.   As  a  statutory matter, the Act simply stops short of prohibiting issue advocacy. Massachusetts Citizens, 479 U.S. at 249; Faucher, 928 F.2d at 471. Turning then to constitutional issues, we face at the outset the claim of the Maine Committee that it has a constitutional right of issue advocacy that is unreasonably burdened by the regulations here at issue. In Massachusetts Citizens, the Supreme Court not only narrowed section 441b by construction but also recognized a First Amendment right to issue advocacy, on behalf of a nonprofit corporation fairly similar  to  the  Maine  Committee, that extends to the publication of voter guides. 479 U.S. at 263.  -7- -7- The difficulty is that in that same case, the Supreme Court stressed as "essential" the fact that the anti-abortion not accept contributions from business orporations  or  unions.   Id. at 264. This was important to the Court  because  it  had  previously sustained the right of Congress to limit the election influence of massed economic power in corporate  or  union form. FEC v. National Right to Work Comm.,  group  there  involved  did   c 459 U.S. 197, 207-10 (1982). And somewhat later, the Court upheld a state statute that barred campaign-related issue advocacy,  out  of  general  funds, by a nonprofit entity funded by business  corporations.   A ustin v. Michigan Chamber of Commerce, 494 U.S. 652, 664-65 (1990). The Maine Committee does accept contributions from other corporations,  Clifton ,  927 F. Supp. at 494, and falls somewhere between  the  entity  protected in Massachusetts Citizens and that held unprotected in Austin. It is unclear what the Supreme Court would say about the existence or extent of a constitutiona l right of campaign-related issue advocacy (using unsegregated funds) claimed by the Maine Committee. Nor does the record permit us to disregard Austin on the ground that corporate  contributions  to the Maine Committee are de minimis.1 1Despite Austin, two circuits have ruled that entities might still obtain the protection of Massachusetts Citizens where  business  contributions were in fact minor even though not strictly banned by the organization. FEC v. Survival Educ. Fund,  Inc.,  65  F.3d  285,  292 (2d Cir. 1995); Day v. Holahan, 34 F.3d 1356, 1364 (8th Cir. 1994), cert. denied, 115 S. Ct. 936 (1995). We take no view as to the correctness of these -8- -8- If the Maine Committee had the same constitutional right to issue advocacy as its Massachusetts counterpart, the two principal rules at issue might well fail under a strict- scrutiny standard. As we will see, the limit on oral contact and the obligation to provide equal space are significant burdens and, as merely prophylactic rules that go beyond the threat  (unauthorized  corporate contributions), the rules likely would not meet the narrow tailoring requirement. FEC v. National Conservative Political Action Comm., 470 U.S. 480, 496, 498-500 (1985). But the Court may hold that the Maine Committee's  acceptance  of corporate contributions brings Austin into play. We think that the present case can be decided on grounds that  do  not  require us to decide whether Austin applies to the Maine Committee, an issue only the Supreme Court can resolve definitively. For even apart from their impact on issue advocacy, the two main FEC rules at issue curtail constitutional rights that corporations unquestionably do possess. Whether the curtailment goes too far as a constitutional matter need not be decided: it is enough that it undermines the FEC's claim of authority for its rules. Starting with the FEC rule requiring substantially equal space  and  prominence, we begin with the proposition that where public issues are involved, government agencies are not decisions. -9- -9- normally  empowered  to  impose and police requirements as to what p s abhorrent to the First Amendment, whether the compulsion is directed against individuals or corporations.2 And while no case  is  an  exact match for this one, Miami Herald comes pretty close. There, the Supreme Court struck down Florida's "right of reply" statute that guaranteed a political candidate equal space  to  reply to newspaper attacks or criticism. 418 U.S. at 256. The Court said that even if no additional costs were imposed by "compulsory access," nevertheless [t]he  choice  of material to go into a newspaper, and made as to limitations on the size and rivate  citizens may say or write. Commercial labeling aside, the Supreme Court has long treated compelled speech a the  decisions content  of  the paper, and treatment of public issues and public officials--whether fair or unfair-- constitute the exercise of editorial control and judgment. Id. at 258. The statute failed even though the state did not dictate  the  content  of  the reply, nor did the newspaper purport to  endorse  it.   Reaffirming Miami Herald, the Supreme Court not 2See McIntyre v. Ohio Elections Comm'n, 115 S. Ct. 1511, 1519-20 (1995); Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, 115 S. Ct. 2338, 2347 (1995); Riley v.  Nat'l  Fed'n of the Blind, 487 U.S. 781, 795 (1988); Pacific Gas  &  Elec.  Co. v. Public Util. Comm'n of Cal., 475 U.S. 1, 16 (1986) (plurality opinion); Wooley v. Maynard, 430 U.S. 705, 714  (1977);  M iami Herald Publ'g Co. v. Tornillo, 418 U.S. 241, 256 (1974); West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943). -10- -10- long ago described that case as involving a law that altered "content." Riley, 487 U.S. at 795. It seems to us no less obnoxious for the FEC to tell the Maine Committee how much space it must devote in its voter guides to the views of particular candidates. We assume a legitimate  FEC interest in preventing disguised contributions; but Florida's interest in fair coverage that prompted its "right  of  reply"  statute  was hardly trivial. The point is that the  interest  cannot  normally be secured by compelling a private entity to express particular views or by requiring it to provide "balance" or equal space or an opportunity to appear. See, e.g., Hurley, 115 S. Ct. at 2347; Miami Herald, 418 U.S. at 256. First  Amendment concerns may be less where the government requires balance or access than where it dictates the precise viewpoint  to  be  expressed. But, unlike "time, place and manner" limitations, the FEC's equal space or prominence requirement, even if mechanically applied, does affect the content of the Maine Committee's voting guide. Thus, the Maine Committee could be compelled to devote substantial space to describing the  position  of a candidate with whom it deeply disagrees. As the Supreme Court said unanimously in Hurley, 115 S. Ct. at 2347: this  general  rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to -11- -11- statements of fact that the speaker would rather avoid, McIntyre, . . . Riley . . . . Few, if any, rights are absolute, but there is a strong First Amendment presumption against content-affecting government  regulation  of  private citizen speech, even where the government  does  not  dictate the viewpoint. See Riley, 487 U.S. at  797-98;  Pa cific Gas, 475 U.S. at 16; Miami Herald, 418 U.S. at 256. Indeed, even for broadcasters and cable monopolies, the Supreme Court has upheld equal coverage and "must carry" provisions  only  because  of the unique control that broadcasters and cable operators have over public access to programming. Turner Broadcasting Sys., Inc. v. FCC, 512 U.S. 622, 655-57 (1994);  Red  Lion Broadcasting Co. v. FCC, 395 U.S. 367, 392-94 (1969). That rationale has no conceivable application to the Maine Committee. The other rule principally at issue is the limitation on oral contact with candidates. We think that this is patently offensive to the First Amendment in a different aspect: it treads heavily upon the right of citizens, individual or corporate, to confer and discuss public matters with their legislative  representatives or candidates for such office. As we have explained, the regulations bar non-written contact regarding the contents, not merely the preparation and distribution, of voter guides and voting records; thus, inquiries  to  candidates  and incumbents about their positions on -12- -12- issues  like  abortion  are  a precise target of the FEC's rules as applied here.3  It is hard to find direct precedent only because efforts to  restrict  this right to communicate freely are so rare. But we think that it is beyond reasonable belief that, to prevent corruption or illicit coordination, the government could prohibit voluntary discussions between citizens and their legislators and candidates on public issues. The only difference between such an outright ban and the FEC rule is that the FEC permits discussion so long as both sides limit themselves to writing. Both principle and practicality make this an inadequate distinction. It  is  no  business of executive branch agencies to dictate the form in which free citizens can confer with their legislative representatives. Further, the restriction is a real handicap on intercourse: the nuances of positions and votes can often be discerned only through oral discussion; as any  courtroom  lawyer  knows, stilted written interrogatories and answers  are  no  substitute for cross-examination. A ban on oral communication , solely for prophylactic reasons, is not readily defensible. 3Indeed, the chilling effect of such a restriction would extend well beyond any discussion directed to a particular voter guide; any inquiry by the Maine Committee to a local representative or candidate regarding his or her position on such issues would be vulnerable even if no mention whatever were made of any voter guide. Cf. Riley, 487 U.S. at 794.  -13- -13- The Supreme Court has echoed this view, albeit in dicta. In upholding the Attorney General's refusal to grant a temporary visa to a foreign journalist invited to participate in academic conferences in the United States, the Court said, The Government also suggests that the First Amendment is inapplicable because appellees have free access to Mandel's ideas through his books and speeches, and because "technological developments," such as tapes or telephone hook-ups, readily supplant his physical presence. This argument overlooks what may be particular qualities inherent in sustained, face-to-face debate, discussion and questioning. . . . [W]e are loath to hold on this record that existence of other alternatives extinguishes altogether any constitutional interest on  the  part  of the appellees in this particular form of access. Kleindienst  v.  Mandel ,  408 U.S. 753, 765 (1972). See also Pell v. Procunier, 417 U.S. 817, 825 (1974). Such  writing-only restrictions have sometimes been upheld in the context of commercial speech, e.g., Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 467 (1978) (limiting in-person attorney  solicitation  of  clients); but the Court has never even remotely approved such a restriction of political expression. In  fact,  in  a companion decision to Ohralik, the Supreme Court found such prophylactic rules unconstitutional as applied to solicitations by nonprofit organizations offering free legal assistance,  explaining  that the latter comprises core protected speech and association, and that in the latter context the First Amendment does not tolerate government regulation that -14- -14- might well pass muster where directed to the "conduct of commercial affairs." In re Primus, 436 U.S. 412, 434 (1978). With  respect  to  both  rules--the equal space and prominence and the writing-only requirements--we readily accept that the government has an interest in unearthing disguised contributions.   But  the  FEC is free to investigate any instance in which it thinks that inquiry has become collaboration; nothing,  apart  from  conclusory allegations, has been offered by the FEC to suggest that ordinary enforcement measures cannot adequately  police  "secret" corporate contributions. Cf. Turner Broadcasting, 512 U.S. at 664, 668 (plurality opinion). What it  cannot  do--at least without direct authorization--is simply to say that it is easier or more convenient to impair First Amendment interests than to prove a violation by conventional means or by more carefully tailored regulations. The FEC might argue that it has not compelled speech or prevented oral access in absolute terms; it has merely said that  these  rules  apply  if a corporation wants to publish voting records  or  voter guides using its general treasury funds. And under  Austin ,  Congress  could constitutionally prohibit business corporations from engaging in these activities except through segregated  funds; possibly, the Maine Committee is in the same position, depending on whether the Court views it as falling under Massachusetts Citizens or under Austin. -15- -15- Yet  the  doctrine  of  unconstitutional conditions limits the government's ability to make someone surrender constitutional rights even to obtain an advantage that could otherwise be withheld.   Se e Regan v. Taxation With Representation of Wash., 461  U.S.  540, 545 (1983). Here, a surrender of such rights is being required in order to do something--to publish political information about voting guides or records--that Congress has not made unlawful. We are not certain that Congress could require this sacrifice based on its own judgment of need, but the law in this realm is far from clear. Compare Rust v. Sullivan ,  500  U.S.  173,  196-200 (1991) with O'Hare Truck Serv., Inc. v. City of Northlake, 116 S. Ct. 2353, 2356-57 (1996).  Still, it is not necessary to resolve this last issue here.   Even  if the rules are otherwise "reasonable," we do not take Congress to have authorized rules that sacrifice First Amendment interests. There is a long tradition of construing statutes  narrowly to avoid constitutional issues. Indeed, the Supreme Court took just such an approach in striking down an NLRB  regulation  as  unauthorized without finding it necessary to decide  the  ultimate First Amendment issue. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568,  575-58  (1988).   Acco rd Chamber of Commerce v. FEC, 69 F.3d 600, 605 (D.C. Cir. 1995) (FEC rules). What  we  have  said  disposes of the two main restrictions in contention--the  equal  space and prominence requirement and oral -16- -16- contacts  ban--both of which appear in the regulation governing voter  guides.   The  voting record regulation does not explicitly contain either the requirement or the ban: it merely says (apart from the unchallenged limitation on express advocacy) that  "[t]he  decision on content and the distribution of voting records shall not be coordinated with any candidate." 11 C.F.R. S 114.4(c)(4).  But,  as  already noted, the FEC told the district judge at oral argument that prohibited "coordination" included seeking an explanation from the representative (for example, where there were several apparently conflicting votes). If the FEC does read its regulation in this fashion, it would to this extent  raise  the same constitutional concern about access, and reflect the same unauthorized use of rulemaking authority. This declaration ought to satisfy the Maine Committee's legitimate concern about misuse of the regulation. Finally,  in  two paragraphs at the close of its brief, the Maine  Committee  also  asserts that the voter guide regulation is unconstitutionally vague in its dual ban on including "an electioneering message" in a voter guide and on seeking to "score or rate the candidates' responses in such a way as to convey an electioneering message." 11 C.F.R. SS 114.4(c)(5)(ii)(D), (E). This restriction applies only where  the  entity  publishing the guide has chosen to contact the candidate. -17- -17- To  our  surprise,  the  FEC  reply brief does not even pretend to explain what the FEC means by "electioneering message"; instead the brief resorts to generalities about the tests for unconstitutional vagueness ("no more than a reasonable degree of certainty can be demanded"), tests mostly used in contexts where  speech  is not involved. It then points to its "advisory opinion  process" as a method for obtaining clarification. The FEC also says that the Maine Committee's argument is perfunctory. It is, but so is the FEC's reply, and the substance of the Maine Committee's concern--vagueness--is readily apparent. The  FEC  might  have  argued that "electioneering message" is simply  another  version  of the ban on express advocacy upheld by the Supreme Court. But the FEC has conspicuously declined to make  that  argument. Nor is it clear why, if the FEC meant the phrase  to  be  limited  to  express advocacy, it did not simply use those words, which are used in a different provision of the same regulation, 11 C.F.R. S 114.4(c)(5)(i), and also in the voting  records  regulation. We are thus entitled to assume that "electioneering message" has a different, broader meaning. The  district  court expressly declined to reach the issue, 927 F. Supp. at 500 n.7, apparently believing that this restriction  could not be severed from other parts of the voter guide  regulation that the district court had struck down. But the  district  court opinion did not explain why and, if the FEC -18- -18- wants  to  assert  severability (its position is not revealed), an argument can be made that the electioneering message ban, if valid, can stand on its own two feet. See K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 294 (1988). We have no intention of trying to resolve any of the issues thus implicated, based on inadequate briefing and in darkness as to the FEC's own position as to content, purpose and severability. The Supreme Court's treatment of related vagueness issues in Buckley, 424 U.S. at 40-44, and Massachusetts Citizens, 479 U.S. at 248-49, suggests that the vagueness attack is not frivolous, but those cases differ in various respects from this one on the merits. And, at the threshold, are issues of severability and ripeness. We therefore conclude that the plaintiffs' attack on the "electioneering  message"  provisions of the regulation should be remanded for further proceedings in the district court. For the same reason, we leave it to the district court to decide whether,  in  the first instance, temporary relief against these provisions is warranted pendente lite. Indeed, the FEC may prefer to defer enforcement of these provisions for the time being, if it seeks certiorari on the other issues decided today. Our discussion leads us to modify the district court's judgment  as  follows: the voting record regulation, 11 C.F.R. S 114.4(c)(4), is declared invalid only insofar as the FEC may -19- -19- purport  to  prohibit  mere  inquiries to candidates, and the voter guide regulation, id. S 114.4(c)(5), is declared invalid only insofar as it limits any contact with candidates to written inquiries  and  replies  and imposes an equal space and prominence restriction. The validity of the "electioneering message" provisions of the latter regulation is remanded for further proceedings in accordance with this opinion. It is so ordered. Dissent follows. -20- -20- BOWNES, Senior Circuit Judge, dissenting.  I dissent because I disagree with the majority's holding that the FEC's written-contact-only regulation infringes the First Amendment guarantee of freedom of speech. Even where governmental regulations have "the potential for substantially infringing the exercise of First Amendment rights," the Supreme Court has "acknowledged that there are governmental interests sufficiently important to outweigh the possibility of infringement, particularly when the free functioning  of  our  national institutions is involved." Buckley v. Valeo, 424 U.S. 1, 66 (1976) (per curiam) (internal quotation marks omitted).  At  this  stage  of  American history, it should be clear to every observer that the disproportionate influence of big money is thwarting our freedom to choose those who govern us. This sad truth becomes more apparent with every election. If preventing  this  is  not  a  compelling governmental interest, I do not know what is. The FEC, through its voter guide regulation, has tried to prevent such abuses, consistent with Supreme Court precedent that protects First Amendment interests. I believe the FEC has successfully navigated a safe path between these competing  concerns, and has achieved a reasonable prophylactic measure  while complying with the Court's teachings. The Court itself  has,  over the years, grown more and more concerned with -21- -21- "domination of the political process" by corporate wealth. Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 659 (1990).   I  believe the written-contact-only requirement in the FEC's voter guide regulation fits comfortably within the Court's guidelines because its burdens on First Amendment freedoms are among those the Court is willing to permit in order to achieve compelling governmental interests like those at issue here, and the requirement is narrowly tailored to achieve that interest. The  majority  strikes down the FEC's written-contact- only rule, citing virtually no authority for its position. I recognize that the plaintiff, Maine Right to Life Committee, Inc. (MRTLC), has articulated a First Amendment interest, but in my view that interest is outweighed by the compelling governmental interest in preventing corruption and corporate domination of the political process. The majority, after finding a First Amendment interest, fails altogether in pursuing this next step in the appropriate First Amendment analysis.  I  believe  that  the  prophylactic measures contained in the FEC's regulation are narrowly tailored to achieve the permissible  end: they do not preclude all oral discussions of issues between groups like MRTLC and electoral candidates, as the majority states, see ante at 12-13 & n.3. The regulation deals only with oral discussions relating to preparation of -22- -22- voter guides. Generally speaking, MRTLC is free to have all the oral discussions that it wishes with candidates, whether motivated by a desire to lobby, to persuade, to debate, or to clarify. The only limitation is that MRTLC not combine its oral "issue advocacy" with a discussion of its plans to spend significant amounts of money to prepare and disseminate voter guides. "[T]here is a vast difference between lobbying and debating  public  issues  on the one hand, and political campaigns for  election  to public office on the other." Austin, 494 U.S. at 678 (Stevens, J., concurring).  The  majority  has set up a straw man and then shot it down, without reliance on any relevant authority. It has failed to address the real issues involving this regulation, and  to  come  to grips with the evolving Supreme Court precedent relating to campaign finance law. I will turn to that precedent after discussing the appropriate standard of review that we should apply in this case. Scope of Review MRTLC has challenged the FEC's regulation on its face,  not  as  applied to MRTLC itself. In attacking the facial validity of a regulation, a plaintiff faces a "heavy burden," to show that the regulation can never be applied constitutiona lly. Rust v. Sullivan, 500 U.S. 173, 183 (1991); Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 797-98 (1984). "The fact that [the -23- -23- regulations] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render [them] wholly invalid." Rust, 500 U.S. at 183 (brackets in original) (quotation omitted). For example, in Buckley, the Court  recognized  that  "[t]here could well be a case" where "the Act's [disclosure] requirements cannot be constitutionally applied," but the Court nevertheless upheld the requirements because  none  of  the  challengers "tendered record evidence" that such  would  actually occur; they merely stated their "fears" of what might happen. 424 U.S. at 71. Thus, where a rule is being challenged on its face, it would be "inappropriate" to strike it down merely because the plaintiff can envision "an imagined unlawful application of the rule." Massachusetts v. United States, 856 F.2d 378, 384 (1st Cir. 1988). See also Renne v. Geary, 501 U.S. 312, 324 (1991) (facial challenge should generally not be entertained when an 'as-applied' challenge could resolve the case). The district court's determination that the FEC's regulation is facially invalid presents a purely legal question, and is therefore reviewable de novo. Duffy v. Sarault, 892 F.2d 139, 145 (1st Cir. 1989).  In reviewing agency action, if Congress has not "directly  addressed  the  precise question at issue," a reviewing court must defer to an agency's interpretation of the statute it is charged with enforcing, if that interpretation is not -24- -24- "manifestly contrary to the statute." Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-44 (1984); Strickland v. Commissioner, Maine Dep't of Human Servs. ,  96  F.3d 542, 545-47 (1st Cir. 1996) ("Strickland II"); Strickland v. Commissioner, Maine Dep't of Human Servs., 48 F.3d  12,  16-17 (1st Cir.), cert. denied, 116 S. Ct. 145 (1995) ("Strickland I"). A reviewing court will not "simply impose its  own  construction"  as  to the meaning of ambiguous or unclear statutory terms, "as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue," and the  agency  has furnished its interpretation, "the question for the court is whether the agency's answer is based on a permissible construction of the statute."4 Chevron, 467 U.S. at 843; Strickland II, 96 F.3d at 546. The FEC "is precisely the type of agency to which [such] deference should presumptively be afforded." FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 37 (1981). Of course, a court will not defer to an agency's interpretation of a statute that is directly contrary to a prior Supreme Court interpretation of the same statutory 4. "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." Chevron, 467 U.S. at 843 n.11 (citing FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 39 (1981)). -25- -25- provision. See Faucher v. FEC, 928 F.2d 468, 471 (1st Cir. 1991). Nor will a court defer to an interpretation that is unconstitutional. I address the First Amendment question de novo, through the prism of the Court's teaching in this area. The Applicable Law Governing Campaign Finance Limitations  The  Supreme  Court  has  observed that the "integrity of our system of representative democracy is undermined" by corruption. Buckley, 424 U.S. at 26-27. Although the Court decided  a  number of cases governing campaign finance law prior to Buckley,5 and although Buckley dealt only with individuals and unincorporated associations and not with corporations as plaintiff MRTLC is here, Buckley is usually viewed as the starting point in any analysis of election law. Buckley was also the first case to interpret the statute applicable here, the Federal Election Campaign Act, as amended in 1974, which significantly tightened federal election campaign financing in the wake of the Watergate scandals. The Court began its analysis by noting that money spent on communication was the equivalent of speech itself.6 5. The Court has recounted some of the long prior history of legislation regulating campaign financing in FEC v. National Right to Work Comm., 459 U.S. 197, 208-09 (1982); Pipefitters v. United States, 407 U.S. 385, 402-12 (1972); United States v. Automobile Workers, 352 U.S. 567, 570-87 (1957). 6. Experience has demonstrated that Buckley may have been too hasty in equating money with speech. Buckley began with the premise that "[d]iscussion of public issues and debate on the qualifications of candidates are integral to the -26- -26- Therefore the Court recognized that limitations on contributions operation of [our] system of government." 424 U.S. at 14.  office is essential." at 14-15. "The First Amendment This is because, in a republic such as ours, "the ability of impinged upon First Amendment values in the the citizenry to make informed choices among candidates for Id. affords the broadest protection to such political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Id. at 14. Because "virtually every means of communicating ideas in today's mass society requires the expenditure of money," the Court in Buckley concluded that "[a] restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." Id. at 19.  In reality, however, Buckley's equation of money and speech does not serve the goal of ensuring that the best ideas emerge from a true (and fair) competition among differing viewpoints. Rather than rewarding people or candidates who put forward good ideas, this system rewards people who happen to control vast amounts of money. In light of the uneven playing field created by the unequal distribution of income and wealth in our society, some people can afford to purchase more of the high-cost means of speech than can other people. The Court has recognized that financial considerations "may make the difference between participating and not participating in some public debate."  See City of Ladue v. Gilleo, 512 U.S. 43, 57 (1994). Thus, "however neutral the government's intentions in enacting a law, the operation of that law may have a vastly uneven impact. There is no equality in a law prohibiting both rich and poor from sleeping under the bridges of Paris." NAACP, Western Region v. City of Richmond, 743 F.2d 1346, 1356 (9th Cir. 1984) (alluding to the famous aphorism of Anatole France); see also Griffin v. Illinois, 351 U.S. 12, 23 (1956) (Frankfurter, J., concurring) (same). Therefore, we must carefully scrutinize even facially neutral laws if their effects on speech "fall unevenly on different viewpoints and groups in society." City of Richmond, 743 F.2d at 1356. And we must avoid giving "one side of a debatable public question an advantage in expressing its views to the people." First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 785-86 (1978). -27- -27- "uninhibited, robust, and wide-open" debate that is necessary to enable people to make informed choices among candidates. Buckley, 424 U.S. at 14 (quotation omitted).  Nevertheless,  the  Court  upheld the FECA's limitations on contributions (by individuals and unincorporated associations) to candidates or their campaign committees. Because our "[d]emocracy depends on a well-informed electorate," id. at 49 n.55; see id. at 14-15, the Court subjected  such  impingement to strict scrutiny. The Court found that, with respect to contributions to a candidate, the impingement was justified by the compelling governmental interest  in  limiting  the  actuality and appearance of corruption resulting from large financial contributions. Id. at 28-29. Likewise,  the Court upheld limits on total contributions by an individual, as a "modest restraint upon protected political activity [that] serves to prevent evasion of the $1,000 contribution limitation by a person who might otherwise contribute massive amounts of money to a particular candidate through the use of unearmarked contributions to political committees  likely  to  contribute to that candidate." Id. at 38. The Court also upheld the Act's limitations on volunteers'  incidental expenses as an acceptable accommodation of Congress's valid interest in encouraging citizen participation while guarding against the "corrupting potential of large financial contributions to candidates." Id. at 36. -28- -28- The Court treated such incidental expenses as an in-kind contribution,  with  the  same ultimate effect as if the money had been contributed directly to the candidate.  The  Buckley  Court treated limitations on independent expenditures differently than limitations on direct contributions to candidates. The Court realistically recognized that those who contributed to a candidate represented "the interests to which [the] candidate is most likely to be responsive." Id. at 67. Nevertheless, in order to avoid vagueness problems, the Court limited FECA's prohibition on independent expenditures to only those expenditures which involved express advocacy. Id. at 44. It went  on  to  strike  down  that prohibition, even as so limited, as violative  of  the  First  Amendment. Id. at 51. In analyzing the First Amendment considerations, the Court stated that expenditure limitations impose greater burdens on basic freedoms  than do contribution limits, and do not accomplish as much to further the goals of eliminating the potential for abuse and quid pro quo corruption. Id. at 44-47.  The Court's more protective approach to independent expenditures, however, applies only to expenditures that are "made totally independently of the candidate[s] and [their] campaign[s]."   Id.  at  47. It found no constitutional infirmity in FECA's treatment of "coordinated" expenditures as contributions  and  therefore subject to FECA's limitations. Id. -29- -29- at 47 & n.53. Expenditures that are "coordinated" with a candidate or his/her campaign -- which are the functional equivalent of an in-kind contribution to the candidate -- are treated as direct contributions to the candidate, rather than as independent expenditures, in order to "prevent attempts to circumvent the Act through prearranged or coordinated expenditures  amounting  to disguised contributions." Id. at 46- 47. This is true regardless of whether the expenditure pays for speech containing express advocacy of a candidate. Thus, limiting such coordinated spending can "foreclose[] an avenue of abuse." Id. at 37. In  upholding  some burdens on First Amendment rights, the Buckley Court recognized a compelling interest in preventing quid pro quo corruption. It noted that, to "the extent  that  large  contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined." Id. at 26-27. Moreover, "[o]f almost equal concern as the danger of actual quid pro quo arrangements is the  impact  of  the  appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." Id. at 27. Since  Buckley was decided, more evidence has come to light demonstrating that big money can skew our democratic election  process,  even  without a quid pro quo. Large donations -30- -30- from wealthy individuals, corporations and labor unions have helped candidates accumulate considerable stockpiles of money with which to advertise for votes. In a series of cases beginning with FEC v. National Right to Work Comm., 459 U.S. 197 (1982) ("NRWC"), the Court has dealt with this problem in the context of S 441b of FECA, which regulates contributions and  expenditures  made  by  corporations and labor organizations.7 In  NRWC ,  FEC  v.  Massachusetts Citizens for Life, Inc., 479 U.S. 238  (1986)  ("Mass.  Citizens" or "MCFL"), and Austin v. Michigan Chamber of Commerce, 494 U.S. 652 (1990), the Court has found a compelling governmental interest in preventing corruption even without a direct quid pro quo promise in exchange for money. The Court has recognized that the integrity of our electoral  system can also be undermined by a different type of corruption: "vast reservoirs of capital" that "distort[] the political process" and prevent it from truly reflecting the voters'  collective evaluation of the merits of the candidates' ideas. See Austin, 494 U.S. at 661. The  plaintiff in National Right to Work Comm. was an expressly ideological nonprofit association which was incorporated  under state law, as is the plaintiff MRTLC in the case  at  bar.   Recognizing that the FECA "reflects a legislative 7. This is to be distinguished from the sections of FECA covered in the relevant portions of Buckley, which dealt with contributions and expenditures made by individuals and unincorporated groups. -31- -31- judgment that the special characteristics of the corporate structure require particularly careful regulation," National Right to Work Comm., 459 U.S. at 209-10, the Court upheld Congress's  right  to  restrict from whom such an organization may solicit contributions. The Court held that NRWC's associational rights8 were overborne by the interests Congress sought to protect in enacting S 441b, including: to  ensure  that substantial aggregations of wealth amassed by the special advantages which go with the corporate form of organization should not be converted into political  'war chests' which could be used to incur political debts from legislators who are aided by the contributions. Id. at 207. "The overriding concern behind the enactment of statutes such as the Federal Corrupt Practices Act was the problem of corruption of elected representatives through the creation of political debts. The importance of the governmental interest in preventing this occurrence has never been doubted." National Right to Work Comm., 459 U.S. at 208 (quotations omitted) (emphasis added). As in Buckley, the Court in NRWC recognized that it was just as important to prevent  the  appearance  of such corrosion as the actuality. Id. at 210. "These interests directly implicate the integrity of our electoral process." Id. at 208 (quotation omitted). 8. Corporations as well as individuals have First Amendment rights. First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 784-86 (1978). -32- -32- Accordingly, the NRWC Court held that "the need for a  broad  prophylactic rule," to protect against such distortion of the political process, was "sufficient . . . to support a limitation on the ability of a committee to raise money for direct  contributions to candidates." Mass. Citizens, 479 U.S. at 260. In  Mass.  Citizens ,  the  Court shifted the focus of its examination  from  S  441b's regulation of corporate contributions to its regulation of corporate independent expenditures. The Court described the "underlying rationale" for "longstanding regulation" of corporate political activity as:  the need to restrict "the influence of political war chests funneled through the corporate form," [FEC v. National Conservative Political Action Comm., 470 U.S. 480, 501 (1985) ("NCPAC")]; to "eliminate  the effect of aggregated wealth on federal elections," Pipefitters [v. United States], 407 U.S. [385,] 416 [(1972)]; to curb the political influence of "those who exercise control over large aggregations of capital," [United States v.] Automobile Workers, 352 U.S. [567,] 585 [(1957)]; and to regulate the "substantial aggregations of wealth amassed  by  the special advantages which go with the corporate form of organization," National  Right to Work Committee, 459 U.S. at 207. Mass. Citizens, 479 U.S. at 257. See also id. at 258-59 (Congress  added  proscription on expenditures to Federal Corrupt Practices Act "to protect the political process from what it deemed to be the corroding effect of money employed in elections by aggregated power") (quotation omitted). -33- -33- The Court in Mass. Citizens recognized that "the corrosive influence of concentrated corporate wealth" can corrupt  "the  integrity of the marketplace of political ideas." 479 U.S. at 257. Regulation of corporate political activity "has  reflected concern not about use of the corporate form per se ,  but  about  the  potential for unfair deployment of wealth for political purposes." Id. at 259. The Court "acknowledge[d] the legitimacy of Congress' concern that organizations that amass  great  wealth in the economic marketplace not gain unfair advantage in the political marketplace." Id. at 263. This concern  is  reflected in S 441b's "require[ment] that corporate independent expenditures be financed through a political committee expressly established to engage in campaign spending," in order to "prevent this threat to the political marketplace." Id. at 258. In order to avoid overbreadth, the Court defined independent expenditures governed by S441b to include only express advocacy of the election or defeat of a candidate. Id. at 249. The Court left open the question whether the First Amendment  permits it to uphold S 441b's general rule -- that a corporation must utilize a voluntary PAC rather than its general  treasury  funds  for independent campaign expenditures as well as for direct contributions to candidates. Instead, the Court carved a narrow exception out of this general rule, holding its prohibition on use of general treasury funds -34- -34- unconstitutional  as  applied to the narrow class of corporations exemplified by the plaintiff in MCFL,9 even though those corporations remained free to speak in unlimited amounts through a separate segregated fund (as opposed to using funds from the corporate treasury).  To  fall  within  the  exception, a corporation must have three  characteristics, each of which is "essential," MCFL, 479 U.S.  at  263:  First, it must be formed for the express purpose of promoting political ideas, and cannot engage in business activities. Second, it must have no shareholders or other persons affiliated who would have a claim on its assets or earnings. Third, it must not be established by a business corporation  or labor union, nor accept contributions from such entities. Id. at 264. The last requirement -- that the corporation does not accept contributions from business corporations or labor unions -- is "essential," because it "prevents such [nonprofit ideological] corporations from serving as conduits for the type of direct spending that creates  a  threat  to  the  political marketplace." Id. at 263-64. In  Austin ,  494 U.S. at 659, the Court elaborated its "concern about corporate domination of the political process" and decided the question left open in Mass. Citizens. The plaintiff  in  Austin, the Chamber of Commerce, had challenged a 9. "It may be that the class of organizations affected by [the Mass. Citizens] holding . . . will be small." Mass. Citizens, 479 U.S. at 264. -35- -35- Michigan statute (similar to 2 U.S.C. S 441b) prohibiting corporations from using treasury funds for independent expenditures in support of a candidate. The Court found that the  statute  burdened political speech at the core, even though the corporation still had the opportunity to speak through PACs.10 Despite this burden on First Amendment rights, the Court held that the burden was justified by a compelling governmental interest in counteracting the "corrosive and distorting effects" of corporate wealth on the political election process. Id. at 660.  State  law  grants  corporations special privileges that enhance their ability to attract capital and deploy resources advantageousl y. These privileges include: limited liability, perpetual  life,  and  favorable treatment of the accumulation and distribution of assets. Id. at 658-59. These state-created advantages enable corporations "to use 'resources amassed in the  economic  marketplace' to obtain 'an unfair advantage in the political marketplace.'" Id. at 659 (quoting Mass. Citizens, 479 U.S. at 257). The Court therefore has "recognized that 10. To require a corporation to use a PAC rather than general corporate treasury funds would require it to comply with a number of obligations it might find burdensome. For example: PACs must designate a treasurer, keep detailed accounts of contributions, and file a statement of organization; PACs cannot use corporate funds at all; and PACs may not solicit contributions except from members, stockholders or officers. See Austin, 494 U.S. at 657 (citing Mass. Citizens, 479 U.S. at 253-54); 2 U.S.C. SS 432- 34; 441b(b)(4)(A), (C). -36- -36- 'the  compelling governmental interest in preventing corruption support[s] the restriction of the influence of political war chests funneled through the corporate form.'" Id. at 659 (brackets in Austin) (quoting National Conservative PAC, 470 U.S. at 500-01). This interest reflects a "concern about corporate domination of the political process." Id. The Court made clear that it was not talking merely about "financial quid pro quo" corruption. Id. at 659. It recognized that the government has a compelling interest in eliminating from the political process a "different type of corruption"  as well: "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas." Id. at 660; see id. at 666. It is because the state confers on corporations legal advantages enabling them to amass abundant "war chests" that it is not unconstitutional for the government to limit independent expenditures by corporations. Id. at 666. The  Court's  holding was not limited merely to direct contributions to candidates. "Corporate wealth can unfairly influence elections when it is deployed in the form of independent expenditures, just as it can when it assumes the guise of political contributions." Id. at 660. The Austin Court therefore held "that the State ha[d] articulated a -37- -37- sufficiently  compelling  rationale to support its restriction on  or  was  this   independent expenditures by corporations."11 Id. N rule specifically limited to for-profit corporations engaged in a commercial business enterprise. As stated,  the  rule  applied  also to nonprofit corporations, which, after all, were the context of the case before the Court as well as the context of National Right to Work Comm. and of Mass. Citizens which relied on the NRWC analysis. Our  circuit  has  also  had  occasion to weigh in on this subject.12 Our opinion in FEC v. Massachusetts Citizens for Life, Inc., 769 F.2d 13 (1st Cir. 1985), aff'd, 479 U.S. 238 (1986),  was  affirmed by the Supreme Court, as described supra, but  was  essentially consistent with the Court's opinion. More recently, this court considered a prior version of the FEC's regulation governing voter guides. Faucher v. FEC, 928 F.2d 468 (1st Cir. 1991). The regulation itself was substantially different from the current regulation, containing provisions 11. The Court held that the plaintiff Chamber of Commerce in Austin did not fall within the narrow class of corporations that Mass. Citizens exempted from this general rule. The Court emphasized the fact that the Chamber "accepts money from for-profit corporations" which "therefore could circumvent the Act's restriction [on their campaign expenditures] by funneling money through the Chamber's general treasury" if the statutory limitations were not applied to the Chamber. Austin, 494 U.S. at 664. 12. I do not discuss opinions of other circuits because the precise issues here -- validity of the present regulations governing voter guides and voting records -- have not been decided previously by any circuit court. -38- -38- restricting the content of any voter guides.13 The prior regulation  had required guides to be "nonpartisan," and listed among  the  factors  the  FEC would consider in determining whether a  guide  was  nonpartisan  the following: "(C) The wording of the questions presented does not suggest or favor any position on the  issues  covered; (D) The voter guide expresses no editorial opinion concerning the issues presented nor does it indicate any support for or opposition to any candidate or political party." Id. at 470 (emphasis added in Faucher).  We  struck  down  these  content-oriented provisions; the speech they inhibited was protected by the First Amendment because it was an independent expenditure that contained no "express advocacy" of a particular candidate. We relied on language in Buckley that had held the FECA's limits on independent expenditures to be unconstitutional unless they involved  "express advocacy." Id. (citing Buckley, 424 U.S. at 42-43).   We  also  relied  on a similar holding in Mass. Citizens, 479 U.S. at 249, which likewise dealt with independent expenditures.   We  declined the FEC's invitation to defer to its interpretation of the statute, on the ground that the Supreme Court  had  already  spoken  directly on the precise issue that was in  dispute.   Faucher ,  928 F.2d at 471. It is worth noting that our decision in Faucher did not address the claim made by the 13. The majority opinion discusses the prior regulation and the present regulation as if they were identical. See ante at 4-5. -39- -39- FEC  in  the  instant case, namely, that the spending of money to publish a voter guide after consultation or coordination with a  candidate  regarding the preparation of the guide constitutes the kind of coordinated expenditure that may be treated as a contribution, not as an independent expenditure, and therefore may be subjected to regulation. The  latest  chapter  in  the continuing saga was written just  last  Term. In Colorado Republican Campaign Comm. v. FEC, 116  S.  Ct.  2309,  2312  (1996) ("Colorado Republican"), the Court struck down the FECA's limits on a political party's expenditures in connection with a campaign, holding them unconstitutional as applied to independent expenditures that were made "without coordination with any candidate." It reiterated  that the government may constitutionally set limits on contributions, including "limits that apply both when an individual  or  political  committee contributes money directly to a  candidate  and also when they indirectly contribute by making expenditures  that they coordinate with the candidate." Id. at 2313  (citing  S 441a). The "constitutionally significant fact" in that case was "the lack of coordination between the candidate and the source of the expenditure." Id. at 2317 (citing Buckley, 424 U.S. at 45-46). (Justice Breyer's plurality opinion mentions "coordination" or "coordinated" expenditures on nearly every page.)  -40- -40- The  Court  reversed the lower court's ruling that, as a matter of law, a party's expenditures should be "conclusive[ly] presum[ed]" to have been coordinated with the eventual  candidate, even though "the record show[ed] no actual coordination as a matter of fact" (and in fact there had been evidence  to  the contrary). Id. at 2317-18. The three-Justice plurality  stated that the determination of coordination with a candidate is a factual matter, and cannot be presumed as a matter of law. Two dissenting Justices would have upheld the FEC's presumption and found it constitutional. On the other hand, four Justices agreed with the Colorado Republican Party that, due to the special role of political  parties in our electoral system, the First Amendment forbids congressional efforts to limit a party's coordinated expenditures as well as independent expenditures. Those Justices would have stricken such limitations on their face.  This position was rejected by the majority of the Court. The three-Justice plurality reached its conclusion on an as-applied basis, explicitly refusing to entertain the facial challenge. While recognizing that restrictions on coordinated expenditures might in some circumstances unduly infringe  on  constitutional rights, the plurality indicated that it would uphold such restrictions in other circumstances, depending  on  the facts of the case at hand. Id. at 2320. The -41- -41- two  dissenting  Justices  would have rejected both the facial and the as-applied challenges. As the foregoing history makes clear, the Court's jurisprudence on campaign finance is evolving, especially with respect  to  the use of corporate wealth in candidate elections. The Court now recognizes that the corrosive and distorting effect of big money to influence elections is a legitimate governmental  concern.14 I turn now to the application of this evolving law to the issue in contention. Analysis  I would hold that the FEC may constitutionally require communications between corporations15 and candidates regarding  voter guides to be in writing.16 While there may be 14. See David Cole, First Amendment Antitrust: The End of Laissez-Faire in Campaign Finance, 9 Yale L. & Pol'y Rev. 236, 278 (1991) (arguing that courts cannot return to a laissez-faire approach in the political field any more than they would return to pre-Lochner laissez-faire in the economic field, and therefore that courts should treat campaign finance regulation as a legitimate exercise of the government's First Amendment antitrust role to preserve the marketplace of ideas).  15. The regulation covers both corporations and labor unions. Because MRTLC is a corporation, I will refer only to corporations in the ensuing discussion. 16. The pertinent part of the FEC's regulation states as follows: (5) Voter guides. A corporation or labor organization may prepare and distribute to the general public voter guides consisting of two or more candidates' positions on campaign issues, including voter guides obtained from a nonprofit organization which is described in 26 -42- -42- circumstances in which such a restriction might b as applied, it surely survives the curren 17 The question is whether we should uphold U.S.C. 501(c)(3) or (c)(4), provided that paragraph (c)(5)(i) or (c)(5)(ii)(A) e unconstitutional t facial challenge. may include in the voter guide biographical information on each through (E) of this section. The sponsor the voter guides comply with either candidate, such as education, employment positions, offices held, and community involvement. (i) The corporation or labor organization shall not contact or in any other way act in cooperation, coordination, or consultation with or at the request or suggestion of the candidates, the candidates' committees or agents regarding the preparation, contents and distribution of the voter guide, and no portion of the voter guide may expressly advocate the election or defeat of one or more clearly identified candidate(s) or candidates of any clearly identified political party. (ii)(A) The corporation or labor organization shall not contact or in any other way act in cooperation, coordination, or consultation with or at the request or suggestion of the candidates, the candidates' committees or agents regarding the preparation, contents and distribution of the voter guide, except that questions may be directed in writing to the candidates included in the voter guide and the candidates may respond in writing. 11 C.F.R. S 114.4(c)(5)(i), (ii)(A). 17. Cf. Austin, 494 U.S. at 674 n.4 (Brennan, J., concurring) (The "central lesson of MCFL [is] that the First Amendment may require exemptions, on an as-applied basis, from expenditure restrictions" if the organization exhibits all three of the required characteristics.) (emphasis added). -43- -43- the FEC's characterization of MRTLC's contact with candidates as  a  coordinated expenditure which, under the FECA, is treated as a contribution and therefore may be regulated. Even with respect to individuals, Buckley created two categories of campaign  spending  which  are to be treated differently. For the most  part,  limits on contributions made to candidates or their campaigns are constitutional; limits on totally independent expenditures  are not (i.e., expenditures "not coordinated with the  candidate or candidate's campaign"). Colorado Republican, 116 S. Ct. at 2313 (citing Buckley, 424 U.S. at 39-51). Expenditures  that are coordinated with the candidate or candidate's campaign, even if not contributed directly to the  candidate, are "treated as contributions," and they can be regulated  just as if they were direct contributions. Buckley, 424  U.S.  at  46  &  n.53;  Co lorado Republican, 116 S. Ct. at 2313. That is, to be treated as independent, rather than as a contribution, an expenditure must be "totally independent[]." Buckley, 424 U.S. at 47. Since this is true for individuals and unincorporated organizations like political parties, it should be at least as true for corporations whose "vast reservoirs of capital," Austin, 494 U.S. at 661, pose more of a  threat  to  "the integrity of our electoral process," National Right to Work Comm., 459 U.S. at 208 (quotation omitted), and therefore "require[] particularly careful regulation," id. at 209-10. -44- -44- The expenditure in this case occupies a middle ground: MRTLC's spending on voter guides is not contributed directly to candidates but is not totally independent either. It  is  coordinated  with  the candidate to some degree. MRTLC may be correct that this is not exactly identical to the coordination that exists when an organization buys $20,000 worth of food for a campaign rally, but it does entail some aspects  of  what is ordinarily thought of as coordination. See Random House Dictionary of the English Language 447 (2d ed. 1987) ("act[ing] in harmonious combination"). And, as I will discuss shortly, it poses some of the same kinds of danger of corruption and distortion of the election process. With this in-between  level of coordination, the question here is whether the  degree  of coordination between MRTLC and the candidates in preparing the voter guides is sufficient to treat the money spent to produce and distribute the guides as a contribution and therefore regulable, taking into account constitutional requirements. See Colorado Republican, 116 S. Ct. at 2320. I agree with the majority that the constitutional issue  cannot  be avoided by resort to statutory interpretation. The  district  court  was  mistaken to conclude that the FEC has no authority to interpret S 441b as it has, simply because the statute does not contain a provision specifically authorizing this particular interpretation. The Act generally empowers (indeed,  requires) the FEC to promulgate rules and regulations -45- -45- "to carry out the provisions of [the] Act," 2 U.S.C. S 438 (a)(8); see also 2 U.S.C. S 437d (a)(8), including "formulat[ing] policy with respect to" the Act. 2 U.S.C. S 437c(b)(1). It is entirely appropriate for an agency to fill in  the  interstices in an ambiguous or incomplete statute. See Chevron ,  467  U.S. at 843-44; Strickland I, 48 F.3d at 21 (when statute is subject to more than one possible interpretation, "it is up to the [agency], not the courts, to balance the relevant  policy  considerations and formulate a rule"). Neither Congress  nor  the Court has specifically addressed the question of what degree of coordination is required before an expenditure may be treated as a contribution under the FECA.  Therefore a reviewing court should defer to the agency's interpretation as long as it is not "manifestly contrary to the statute," which cannot be said of the regulation at issue here. See id. at 844; Strickland II, 96 F.3d at 547 ("court must avoid inserting its own policy considerations into the mix"). Looking to other parts of the FECA  for  guidance,  according to the general definitions section of  the  Act,  2  U.S.C.  S  431(17), an expenditure by a corporation that  is  made  in "cooperation or consultation" with a candidate does not qualify as an "independent expenditure." It would therefore  be  treated as an indirect contribution under S 441b, as  interpreted in Buckley, 424 U.S. at 46 & n.53, and Colorado Republican ,  116  S.  Ct.  at 2313. In addition, another provision -46- -46- of the Act explicitly states that, for purposes of subsection 441a(a), "expenditures made by any person in cooperation, consultation,  or  concert, with, or at the request or suggestion of,  a  candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate." 2 U.S.C. S 441a(a)(7)(B)(i) (emphasis added). This provision makes explicit Congress's intention that coordinated expenditures like those here -- spending on voter guides that were prepared after consultation and cooperation with candidates -- be considered contributions, at least for purposes of S 441a. "[T]here is a presumption that a given term is used to mean the same thing throughout a statute." Brown v. Gardner, 513 U.S. 115, 118 (1994). In light of this canon of statutory  construction,  and because nothing in S 441b specifies a  different  view  of  the  term "contribution," I see no reason to second-guess the FEC's interpretation that expenditures on voter guides, the preparation of which is coordinated with candidates,  should be treated as contributions under S 441b as well as under S 441a. See Chevron, 467 U.S. at 844. I turn now  to  the  question  whether the statute is constitutional as so interpreted.  As already noted, plaintiff MRTLC challenges the FEC's interpretation on its face, not as-applied. With an -47- -47- exception  not applicable here,18 in order to prevail on such a challenge, the plaintiff must show that the regulation can never be applied constitutionally. Rust, 500 U.S. at 183. This the plaintiff cannot do: MRTLC itself exemplifies an organization to which the written-contact-only regulation, 11 C.F.R. S 114.4(c)(5)(ii)(A), may constitutionally be applied. MRTLC's  expenditure on voter guides is not totally independent of the candidates, which would be necessary to be entitled to the full protection of Buckley and its progeny. It is a coordinated expenditure that is legitimately treated as if it were a contribution and, as such, may be regulated by the FEC under FECA, at least by means of this limited prophylactic measure  requiring  that  MRTLC's contacts with candidates be only in writing. "When deciding whether a[n] . . . election law violates First and Fourteenth Amendment associational rights, we weigh the character and magnitude of the burden the . . . 18. An alternative way for the plaintiff to prevail on a facial attack would be to demonstrate that, even though the challenged law "may be validly applied to the plaintiff and others, it nevertheless is so broad that it may inhibit the constitutionally protected speech of third parties." New York State Club Ass'n, Inc. v. New York City, 487 U.S. 1, 11 (1988) (quotation omitted). A facial overbreadth challenge is "an exception to ordinary standing requirements" and "will not succeed unless the statute is substantially overbroad, which requires the court to find a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." Id. (quotation omitted). In the instant case, MRTLC's brief does not begin to meet its burden in this respect. -48- -48- rule imposes on those rights against the interests the [government] contends justify that burden, and consider the extent to which the [government's] concerns make the burden necessary."   Timmons v. Twin Cities Area New Party, 117 S. Ct. 1364, 1370 (1997) (internal quotation marks omitted). As in Buckley and Austin, when an expenditure is coordinated with a candidate, it may be treated as a contribution, in part because in both situations the burden on constitutional rights is less than would be the case for a totally independent expenditure. Buckley found contribution limits to be "only a marginal restriction upon the contributor's  ability  to  engage in free communication," because "the transformation of contributions into political debate involves speech by someone other than the contributor." 424 U.S. at 20 (emphasis added).  Similarly  in  the case at bar, to the extent MRTLC is seeking  merely to distribute a purportedly accurate reflection of  the  candid ates' views on the issues, distributing the voter guides  is  more  like  helping certain candidates to express their views through a contribution, as distinguished from the organization's expressing its views. The burden on MRTLC's First Amendment rights is therefore less than it would be if the  voter  guides  purported to represent MRTLC's own views. See id. -49- -49- In addition, as Justice Brennan, one of the Supreme Court's great champions of First Amendment rights to free speech and association, noted in his concurrence in Austin, even  the  greater  restrictions approved by the Court there would not  impose  an excessive burden on a corporation because it was allowed to speak through PACs, even if not through general treasury funds. Austin, 494 U.S. at 669 n.1, 671 n.2. He listed "many avenues of communication" still open to the plaintiff there (the Chamber of Commerce), which showed that "the segregated fund requirement in practice has not burdened significantly the Chamber's speech." Id. at 676 n.7; see Timmons, 117 S. Ct. at 1371. "[T]here is a vast difference between lobbying and debating public issues on the one hand, and political campaigns for election to public office on the other." Austin, 494 U.S. at 678 (Stevens, J., concurring). The burden on MRTLC's constitutional rights here is even less intrusive. The regulation's requirement that any contact with candidates be in writing is itself a relatively minor restriction, more analogous to the disclosure requirements upheld in Buckley than to Austin's limitation on independent expenditures which the Court nevertheless upheld, although acknowledging that it would impose a heavy burden on First  Amendment  rights.   The written-contact-only rule does not impose even as much burden on First Amendment rights as the limitations on contributions upheld in Buckley. In contrast -50- -50- to  the  limitations  upheld in Buckley and Austin on the absolute amount of money spent, in the case at bar the type of restriction imposed by the FEC's written-contact-only regulation  does  not  limit the quantity of speech in any way; it simply specifies the manner in which the corporation consults with candidates in preparing its voter guides. Thus, the regulation is significantly less intrusive on MRTLC's First Amendment  rights than those absolute limits on the quantity of speech.19  The writing requirement is also content-neutral (in both purpose and effect): it does not prefer any one message over another in MRTLC's voter guides, as long as the guides were prepared without any oral contact with the candidates. The rule is completely indifferent to the issues the corporation wishes to address in its voter guides and to the positions the corporation itself takes on those issues. In addition, MRTLC may say anything it wants to a candidate (or ask any questions it wants) during the preparation of the 19. The Court recently rejected a claim based upon what appears to me to be a much more intrusive burden. Timmons, 117 S. Ct. at 1372. Because the "independent expression of a political party's views is core First Amendment activity," id. at 1369 (internal quotation marks omitted), a political party had claimed that the state's ban on fusion candidates unconstitutionally burdened the party's right to communicate, in that the ban prevented the party from "using the ballot to communicate to the public that it supports a particular candidate" and the ban "shut[] off one possible avenue a party might use to send a message to its preferred candidate." Id. at 1372. The Court rejected the claim and upheld the ban. Id. -51- -51- guides,  as  long as it does so in writing. The regulation does not limit the content of the communication between MRTLC and the candidates, only the manner (written or non-written) in which such communication is effectuated.20  Moreover, as in Austin, the written-contact-only regulation applies only to the organization's use of general treasury funds; it does not apply at all to PAC money from a separate  segregated  fund. If MRTLC were willing to comply with the  reporting and other requirements by which the FEC monitors ordinary  corporate PACs, then it would not have to comply with the challenged restriction.21 In addition, the written- contact-only  rule does not apply at all to totally independent issue advocacy to the public, upon which Austin permitted restrictions. If MRTLC engaged in no consultation with the candidates  at all, it could publish voter guides, even pay for them  out  of  its  general  corporate treasury, advocating whatever position it wanted to, on any issue, as long as it did not expressly advocate the election or defeat of a clearly 20. Other portions of the voter guide regulation, S 114.4(c)(5)(ii)(B)-(E), do contain restrictions on contents - - forbidding guides that devote more prominence to one candidate than another or that contain an electioneering message. The written-contact-only rule, S 114.4(c)(5)(ii)(A), however, does not contain content-based requirements. 21. Corporations may use general treasury funds (as well as PAC funds) to finance communications with their members, stockholders, and executive and administrative personnel, on any subject. 2 U.S.C. S 431(9)(B)(iii). -52- -52- identified candidate. Thus, the burden on First Amendment rights  posed  by the challenged regulation is relatively small. Even where governmental regulations have "the potential for substantially infringing the exercise of First Amendment rights," the Court has "acknowledged that there are governmental interests sufficiently important to outweigh the possibility of infringement, particularly when the free functioning of our national institutions is involved." Buckley ,  424  U.S.  at  66  (internal quotation marks omitted); see Timmons, 117 S. Ct. at 1369 ("'[A]s a practical matter, there must  be  a  substantial  regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is  to  accompany the democratic process.'") (quoting Burdick v. Takushi, 504 U.S. 428, 433 (1992)). The Court has repeatedly held that burdens on First Amendment rights more significant than  those  involved in the instant case were outweighed by the potential for corruption, Buckley, and by the corrosive and distorting effects of corporate wealth, Austin. Cf. Burdick, 504  U.S.  at  434 ("[T]he rigorousness of [the] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment  rights.");  Werm e v. Merrill, 84 F.3d 479, 483-84 (1st Cir. 1996). Moreover, as the Court said in Mass. Citizens, "restrictions on contributions require less compelling -53- -53- justification than restrictions on independent spending. MCFL was required, "the need for a broad prophylactic " , 479 U.S. at 259-60 (emphasis added). Because less of a justification rule was thus sufficient . . . to support a limitation on the ability  of  a  committee to raise money for direct contributions to candidates."22 Id. at 260.  In Austin, the Court went further; it upheld a rule restricting  a nonprofit corporation's independent expenditures as well as contributions, justified by the fact that all corporations  both "receive from the State the special benefits conferred  by  the corporate structure and present the potential for distorting the political process." 494 U.S. at 661; see id. at 663 n.2 (recognizing "the possible distortion of the political process inherent in independent expenditures from general  corporate funds") (emphasis added). Because the Court found  that  "[c]orporate  wealth can unfairly influence elections when it is deployed in the form of independent expenditures, just as it can when it assumes the guise of political 22. The Court was not troubled by the fact that a prophylactic rule might sweep broadly, restricting corporations with less money as well as those with substantial war chests. Austin, 494 U.S. at 661. Because it is the "potential" for big money to have an unfair influence that "demands regulation," the Court would not "second guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared." National Right to Work Comm., 459 U.S. at 210. See also Buckley, 424 U.S. at 84 (upholding disclosure rules that required even law-abiding PACs to keep records of independent expenditures as a prophylactic measure necessary for the FEC to be able to enforce the law's other requirements effectively). -54- -54- contributions,"  id.  at  660, the Court concluded that preventing "corporate domination of the political process" was a sufficiently compelling interest to justify the burdens on a nonprofit corporation's First Amendment rights, even in the context of totally independent expenditures. Id. at 659.  Surely, then, the same concerns are sufficiently compelling where, as here, corporate wealth is deployed in an in-between  form,  i.e.,  spending that is not totally independent but rather entails some degree of coordination with the candidates.   The majority protects the freedom of corporations to meet face-to-face with a candidate, in order to secretly plan the content and presentation of voter guides that the corporation will distribute to the public. I believe this concern  should be secondary to protecting the integrity of our electoral process. See Buckley, 424 U.S. at 66. The government has a compelling interest in taking prophylactic measures to prevent the coercion and corruption that would arise if a corporation like MRTLC offered to provide valuable in-kind  assistance  (providing expensive advertising for free)23 to a candidate on the condition that the candidate take the 23. The candidate does not have to pay for publishing the "voter guide," which can nevertheless greatly benefit his or her campaign: the guide will highlight the candidate's pro- life position (or the pro-choice position of his or her opponent) and will be mailed to voters who presumably share MRTLC's views on this issue. This could save the candidate a considerable sum to publicize his or her positions in a favorable light to a targeted group of voters to whom this issue is particularly important.  -55- -55- position  the  corporation  demands, and to prevent the appearance FEC regulation prohibiting unwritten contact wit d of such coercion or corruption.  The FEC is legitimately concerned about the danger. The h candidates was designed to foreclose the abuse that coul potentially arise from a corporation like MRTLC pressuring a candidate  to  amend his or her position on an issue, on pain of losing this kind of substantial in-kind contribution.24 According to the FEC, a prophylactic rule is needed so corporations do not induce candidates to change positions merely  because they need the money to finance their campaigns, even if they do not actually agree with the change. If the question were the FEC's authority to regulate an organization offering a $20,000 cash contribution to a candidate if she would agree to change her position to one of support for the organization's position on a particular piece of legislation, there would be no question of the FEC's authority to regulate the  organization.   I  see  no reason why the result should not be 24. Prior to Buckley, when contributors could give money to a campaign either through direct contributions or independent expenditures, they usually chose the direct route. But since the Buckley decision, which foreclosed that route (for expenditures beyond certain limits), they have had to find other ways to financially benefit the candidate's campaign by giving independently. "It would naively underestimate the ingenuity and resourcefulness of persons and groups desiring to buy influence to believe that they would have much difficulty devising expenditures that skirted the restriction on express advocacy of election or defeat but nevertheless benefited the candidate's campaign." Buckley, 424 U.S. at 45. -56- -56- the same if the organization offers instead $20,000 worth of pamphlets presenting the candidate's view on this issue in a favorable, rather than an unfavorable, light.  Consider the following scenario. An organization consults with a candidate regarding his or her plans or needs in the campaign, and then says to the candidate: "You have stated  the  position you believe in, but we disagree with it in certain respects. We plan to spend $20,000 to print voter guides  and  distribute them largely to persons in sympathy with our views. If you modify your position to be more like ours, our  voter  guides  will  tell people that you support our position and  your  opponent does not. If you don't modify your stand as we  suggest,  we  will  spend the money on voter guides which paint you in an unfavorable light."  The  prophylactic measure required by the FEC rule is simply that discussions with candidates about the preparation of voter guides be in writing, and not oral. Non-written communications with candidates about voter guides present an opportunity  for  the  kind  of dangerous quid pro quo at the heart of the compelling justification that the Supreme Court has repeatedly relied upon in upholding the Act's restrictions on contributions and coordinated expenditures. "[I]n-person solicitation  may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection." Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, -57- -57- 457  (1978).   Unlike  a  written communication, an oral discussion "is not visible or otherwise open to public scrutiny. Often there is no witness other than the [parties to the conversation], rendering it difficult or impossible to obtain reliable proof of what actually took place." Id. at 466. Under the majority's position sustaining MRTLC's view, corporate  voter guides "would be virtually immune to effective oversight and regulation."25 Id. I agree with the FEC that the written-contact-only requirement "eliminates the possibility of unrecorded conversations that could entice or coerce a candidate to alter his or her positions in exchange for favorable treatment in a voting guide." FEC Brief at 31. Such coercion exemplifies the kind of distortion of our political process with "immense aggregations of wealth" of which  Austin , 494 U.S. at 660, and Mass. Citizens, 479 U.S. at 263, would disapprove, and which the FEC may regulate with prophylactic measures like its written-contact-only requirement. I conclude that "[i]t therefore is not unreasonable, or violative of the Constitution, for [the FEC] to respond with what in effect is a prophylactic rule." Ohralik, 436 U.S. at 467. 25. The district court itself was "sympathetic to the argument that enforcement is more difficult if the FEC cannot prohibit all oral communications and make enforcement decisions on simple criteria easily applied to written questions and answers." 927 F. Supp. at 500.  -58- -58- The plaintiff relies heavily on Mass. Citizen "), 479 U.S. at 263-64, which emphasized the difference s ("MCFL between the type of corporation before the Court there and an ordinary, business-oriented corporation whose independent expenditures (even if not coordinated with a candidate to the extent these voter guides are) may be restricted without violating  the First Amendment.26 Austin, 494 U.S. at 660. It is true that MCFL exempts from FECA's general rule a "small" group  of  corporations that do not pose the same kind of threat to the electoral process, MCFL, 479 U.S. at 263-64, because they do not have access to "vast reservoirs" of corporate wealth (among other factors), Austin, 494 U.S. at 661, 664. But  the  significant  fact  in MCFL was not that the plaintiff was a nonprofit ideological corporation: indeed, in Austin, the Court upheld the constitutionality of regulations restricting independent expenditures by a nonprofit ideological corporation. Id. at 659-60. Just as in Austin, the instant case is distinguishab le from MCFL. In Austin, "the Constitution [did] not  require  that  [the  plaintiff] be exempted from the generally applicable  provisions" of the campaign finance law, because it "[did] not share [the three] crucial features" that justified 26. It is significant that the holding in MCFL was limited to an as applied analysis of the facts pertaining to the plaintiff before the Court. It did not extend to a facial challenge as the instant case purports to be. -59- -59- the narrow MCFL exception. Austin, 494 U.S. at 662. In the instant case, MRTLC accepts contributions from for-profit business  corporations and intends to continue doing so. MRTLC does not eschew those "vast reservoirs of capital." Austin, 494 U.S. at 661. This is the point on which the Chamber of Commerce in Austin differed "most greatly" from the plaintiff in Mass. Citizens. Austin, 494 U.S. at 664. The source of MRTLC's  funds  creates  the potential that MRTLC will "serv[e] as [a] condui[t] for the type of direct spending that creates a threat to the political marketplace." Id. at 664 (quoting Mass. Citizens, 479 U.S. at 264) (brackets in Austin). This would enable for-profit business corporations -- themselves "barred  from  making  independent expenditures directly," Austin, 494  U.S.  at  673-74 (Brennan, J., concurring) -- to "circumvent the Act's restriction [on corporate financing of election campaigns] by funneling money through [MRTLC's] general treasury." Austin, 494 U.S. at 664. Cf. California Medical Ass'n v. FEC, 453 U.S. 182, 197-99 (1981) (plurality opinion) (danger of evasion of limits on contribution to candidates justified prophylactic limitation on contributions to PACs). Finally, the FEC's written-contact-only rule for preparing voter guides is narrowly tailored to address the governmental  interest  here. It does not stop corporations like MRTLC from communicating their views about abortion or about particular  candidates  to  the public; nor does it stop them from -60- -60- communicating with candidates to lobby them to change their positions, as long as the lobbying is not done in the context of offering what could be the functional equivalent of an extremely  valuable in-kind contribution; it does not even stop them from communicating with candidates to gain information about  candidate  positions to include in the corporation's voter guide.   All  it  does  is  require the latter type of communication directly with candidates to be done in writing, for prophylactic reasons. I agree with the FEC that, in the context of this case, "oral conversations, unlike written questions,  inherently  provide an opportunity for prearrangement and coordination, while adding little or no additional information  necessary  to  produce a voting guide." FEC Brief at 33. In Austin, the Court found that a statute was "precisely targeted to eliminate the distortion caused by corporate  spending while also allowing corporations to express their  political  views,"  where the statute permitted independent political expenditures through PACs but forbade such expenditures from general corporate treasury funds. 494 U.S. at 660. The Court concluded that the statute was not overinclusive merely because it imposed the same restrictions on small companies that did not "possess vast reservoirs of capital."   Id . at 661. The Court noted that National Right to Work Comm. had rejected a similar overinclusion argument, -61- -61- because "it is the potential for such influence that demands regulation." Id. (quotation omitted). The written-contact- only regulation is likewise sufficiently narrowly tailored. I  conclude  that the FEC may construe a corporation's contact  with  candidates in the preparation of a voter guide as "coordination" with the candidates. Therefore the FEC may treat  the  expenditure of money on those voter guides as an in- kind  contribution  to  the  candidates. In this context, the need for a prophylactic rule is sufficient to justify the limited restriction imposed by the written-contact-only regulation. I am mindful that MRTLC's challenge here is facial, not  as-applied.   MRTLC  is not asking us to consider whether the written-contact-only  rule is unconstitutional as applied to it. Therefore,  I  do not consider whether, if a full factual record were before us, MRTLC might be able to show that it is not in fact a conduit for corporate wealth. Thus, even if the regulation would be unconstitutional as applied to someone, a facial  challenge like the present one must fail where even the plaintiff appears to exemplify a situation where the written- contact-only regulation may constitutionally be applied. Cf. Austin, 494 U.S. at 674 n.4 (Brennan, J., concurring). Conclusion I  believe  that the majority has misstated the thrust of  the  FEC's  written-contact-only regulation. The issue is not as simple nor as amenable to broad-brushed analysis as the -62- -62- majority thinks. It cannot be resolved without examining the evolution of Supreme Court case law, which the majority has ignored. Because, as I read the case law, we should uphold this prophylactic regulation, I respectfully dissent. -63- -63-