Nancy STRICKLAND, et al.,
Plaintiffs, Appellants,

v.

COMMISSIONER, MAINE DEPARTMENT OF HUMAN SERVICES,
Defendant, Appellee,

v.

SECRETARY, U.S. DEPARTMENT OF AGRICULTURE, Third–Party
Defendant, Appellee.

No. 96–1435.

United States Court of Appeals,
First Circuit.

Heard Sept. 5, 1996.

Decided Sept. 24, 1996.

See also, 48 F.3d 12.

Rufus E. Brown, Portland, ME, with whom Jack Comart, Patrick Ende, and Pine Tree Legal Assistance, Inc., Augusta, ME, were on brief, for appellants.

Jennifer H. Zacks, Attorney, Civil Division, Dept. of Justice, Washington, DC, with whom Frank W. Hunger, Assistant Attorney General, Mark B. Stern, Attorney, Civil Division, Dept. of Justice, Washington, DC, and Jay McCloskey, United States Attorney, Bangor, ME, were on brief, for Secretary of Agriculture.

Before SELYA, Circuit Judge, ALDRICH and BOWNES, Senior Circuit Judges.

SELYA, Circuit Judge.

Nearly four centuries ago, an English playwright wrote of a young monarch exhort-

ing his battle-weary comrades to stride "once more unto the breach, dear friends, once more." William Shakespeare, *King Henry the Fifth*, Act III, Sc. 1, 1.1 (1600). Nancy and Lyle Strickland, the appellants here, issue a similar call, again requesting that this court invalidate a regulation which the Secretary of Agriculture (the Secretary) promulgated under authority granted by the Food Stamp Act, 7 U.S.C. §§ 2011–2025 (1988) (the Act). In *Strickland v. Commissioner, Me. Dept. of Human Servs.*, 48 F.3d 12 (1st Cir.), *cert. denied*, — U.S. —, 116 S.Ct. 145, 133 L.Ed.2d 91 (1995) (*Strickland I*), we applied the teachings of *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and upheld a portion of the regulation that gave meaning to an ambiguous phrase contained within the Act. *See Strickland I*, 48 F.3d at 21 (upholding 7 C.F.R. § 273.11(a)(4)(ii)(D) (1994) as a reasonable rendition of 7 U.S.C. § 2014(d)(9)). This second time around the appellants seek to strike down a different (but closely related) section of the same regulation. Because *Chevron* is still the law of the land, we affirm the lower court's entry of summary judgment in the appellees' favor.

## I. THE STATUTORY SCHEME

First enacted in 1964, the Act is designed "to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011; *see generally Strickland I*, 48 F.3d at 14–15. The states administer most aspects of the Food Stamp Program (the Program) while the federal government underwrites the cost (which now amounts to some $29 billion per year). Recipients, whose eligibility is determined by income and family size, receive assistance in the form of coupons that may be used to purchase groceries at local stores. In order to implement the Program, Congress has authorized the Secretary to promulgate "such regulations ... as [he] deems necessary or appropriate for the effective and efficient administration" of the Program's federal aspects. *See* 7 U.S.C. § 2013(a), (c). Responsibility for other elements of the Program devolves upon state agencies. In Maine, that obligation reposes with the Department of Human Services (DHS).

In 1971, Congress instructed the Secretary to set national eligibility standards for the Program. The Secretary did so. Of particular interest for present purposes, the Secretary barred any consideration of principal payments made on the purchase price of capital assets in computing the costs which could be offset against the income of a self-employed individual to determine whether that person met the national eligibility standard. *See* 36 Fed.Reg. 14102, 14107 (July 29, 1971). Six years later, Congress overhauled the Act. It directed, *inter alia*, that for purposes of determining eligibility for participation in the Program, a person's income should not include the "cost of producing self-employment income." 7 U.S.C. § 2014(d)(9). Though Congress did not define the term "cost," the House Committee on Agriculture noted, seemingly with approbation, that existing Program regulations did not treat principal payments as a "cost" that could be set off against income. *See* H. Rep. No. 464, 95th Cong., 1st Sess. 25, *reprinted in* 1977 U.S.C.C.A.N. 1704, 1978, 2001–02.

Throughout, the Secretary has consistently hewed to the position that principal payments on capital assets are not a cost of producing self-employment income. The current regulation epitomizes this longstanding viewpoint; it states that "cost," when figured for that purpose, shall not include "[p]ayments on the principal of the purchase price of income-producing real estate and capital assets, equipment, machinery, and other durable goods." 7 C.F.R. § 273.11(a)(4)(ii)(A).

## II. THE COURSE OF LITIGATION

Mr. and Mrs. Strickland operate a construction business in Belgrade, Maine (where they reside). When their business faltered, they applied for admission to the Program and began receiving benefits. In 1993 the DHS determined that the Stricklands' average monthly income was more than double the Program's eligibility limit. Had they been permitted to deduct depreciation on business equipment as a "cost of producing

self-employment income," they would have remained eligible for food stamp assistance. Consequently, they challenged the regulation that excluded depreciation, 7 C.F.R. § 273.11(a)(4)(ii)(D), arguing that it had been promulgated in derogation of 7 U.S.C. § 2014(d)(9). *See Strickland I*, 48 F.3d at 15–16. In due season the appellants asserted claims against both the DHS and the Secretary, and the district court certified the Stricklands as representatives of a class of "all Maine food stamp applicants or recipients adversely affected by the [ ] regulation on or after July 1, 1992." *Id.* at 16.

The appellants enjoyed some initial success. After the parties submitted the case on a stipulated record, the trial court invalidated the Secretary's "no depreciation" regulation. *See Strickland v. Commissioner, Me. DHS*, 849 F.Supp. 818 (D.Me.1994). We reversed, finding ambiguity in the term "cost" as used in the statutory phrase "cost of producing self-employment income." *See Strickland I*, 48 F.3d at 19. Stressing that ambiguity made deference appropriate, we upheld the Secretary's right to exclude depreciation from "cost" as a permissible rendition of the statute. *See id.* at 21. In what may now be viewed as an overabundance of caution, we noted that the parties' arguments in *Strickland I* did "not require us to decide whether self-employed food stamp recipients must be given some alternative deduction, such as a deduction for replacement costs, in recognition of either the cost of acquiring capital goods or their consumption in the course of producing income." *Id.* at 21 n. 6.[1]

Apparently convinced that a judicial footnote is a terrible thing to waste, the Stricklands promptly reformulated their suit to challenge that portion of 7 C.F.R. § 273.11(a)(4)(ii) in which the Secretary purposed to exclude payments on the principal of the purchase price of capital assets, averring that a favorable finding would entitle them to continued eligibility for food stamp assistance.

This about-face proved unproductive. The district court granted summary judgment in favor of the state and federal defendants, holding that the Secretary permissibly excluded principal payments in determining the cost of producing self-employment income. *See Strickland v. Commissioner, Me. DHS*, 921 F.Supp. 21, 24 (D.Me.1996) (*Strickland II* ) (concluding that "if the Secretary is not required to recognize even depreciation, he certainly cannot be *required* to recognize cash principal payments"). This appeal followed.

## III. STANDARD OF REVIEW

■ Because the interpretation of a statute or regulation presents a purely legal question, courts subject that interpretation to de novo review. *See United States v. Gifford*, 17 F.3d 462, 472 (1st Cir.1994); *Liberty Mut. Ins. Co. v. Commercial Union Ins. Co.*, 978 F.2d 750, 757 (1st Cir.1992). This standard of review is between appellate tribunals and lower courts. It does not diminish the deference that courts must accord to authoritative interpretations of opaque statutory provisions undertaken by those whom Congress has empowered to administer or enforce particular laws. As we have regularly held, such deference is due the Secretary's interpretation of a less-than-pellucid food stamp statute. *See, e.g., Strickland I*, 48 F.3d at 16; *Massachusetts v. Secretary of Agric.*, 984 F.2d 514, 520–21 (1st Cir.), *cert. denied*, 510 U.S. 822, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993); *see also* 7 U.S.C. § 2013(a), (c) (empowering the Secretary to administer the Act).

## IV. ANALYSIS

■ When courts review an agency's interpretation of a statute that it administers, *Chevron* directs them to engage in a bifurcated inquiry. *See Passamaquoddy Tribe v. State of Me.*, 75 F.3d 784, 794 (1st Cir.1996); *Strickland I*, 48 F.3d at 16. In an oft-quoted passage, the *Chevron* Court delineated the nature of the inquiry:

> authority to disallow principal payments on equipment loans as a cost of producing self-employment income.

---

1. That issue was neither briefed nor argued in this court during the pendency of *Strickland I*. In any event, the appellants had told the district court that they did not dispute the Secretary's

First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82 (footnotes omitted). These are the same questions that this court posed in *Strickland I*, 48 F.3d at 16, and we retrace our steps to the extent appropriate.

### A

▪ We first look to see if Congress has spoken to the precise question at issue by mandating either the inclusion or the exclusion of principal payments on capital assets from the computation of the "cost of producing self-employment income" under 7 U.S.C. § 2014(d)(9).[2] Since this branch of the inquiry deals exclusively with statutory construc-

tion and congressional intent, no deference is due the Secretary's views.

In *Strickland I* we determined that the statute, 7 U.S.C. § 2014(d)(9), did not require depreciation to be included as a "cost of producing self-employment income." In reaching this conclusion, we focused on the ambiguity inherent in the word "cost"—a word that Congress chose not to define. We concluded that "the word 'cost' is a chameleon, capable of taking on different meanings, and shades of meaning, depending on the subject matter and the circumstances of each particular usage." *Strickland I*, 48 F.3d at 19.[3] We therefore found that Congress had not spoken directly to the matter at issue. *See id.* at 19–20.

▪ Although *Strickland I* did not address exactly the same question that confronts us today, we agree with the district court that its analysis controls. The appellants would have us believe that by some thaumaturgical sleight-of-hand the word "cost" has acquired a plain meaning in the brief interval since we decided *Strickland I*. They seek to persuade us that, though "cost" was not clear enough to force the inclusion of depreciation, the word nonetheless possesses sufficient clarity to force the inclusion of either principal payments on capital assets, or, at least, some offset for the expense of acquiring and using up such assets.[4] We are

2. In their complaint, the appellants asked the district court to strike down the Secretary's policy, embodied in 7 C.F.R. § 273.11(a)(4)(ii)(A), of disallowing principal payments made to purchase capital assets (which they term "capital costs"). The district court confined its ruling accordingly. *See Strickland II*, 921 F.Supp. at 24–25. At oral argument before us, however, the appellants' counsel suggested that the pivotal issue should be cast in broader terms; he posed the ultimate question of whether the Secretary's general regulatory scheme, in not allowing any offset for wear and tear on capital assets by means of depreciation, principal payments, or otherwise, is permissible. For purposes of *Chevron*'s first step, it makes no difference whether we accept or reject this formulation of the issue. Because the statute (and, particularly, the word "cost") is ambiguous, *see* text *infra*, either formulation of the issue leads ineluctably to the second step of the *Chevron* inquiry.

3. Though noting the open question as to whether legislative history could be considered at the first

stage of a *Chevron* inquiry, *see Strickland I*, 48 F.3d at 16–18, we examined the slim legislative history underpinning 7 U.S.C. § 2014(d)(9) and deemed it insufficient to "suck the elasticity from the word 'cost' and convey an 'unambiguously expressed intent of Congress,'" *id.* at 19–20 (quoting *Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781). That conclusion remains unscathed.

4. In this connection, we are puzzled by the appellants' reliance on *Estey v. Commissioner, Me. DHS*, 21 F.3d 1198 (1st Cir.1994). We ruled there that the term "energy assistance" had a generally understood meaning and then proceeded to apply that meaning to a particular set of facts. *See id.* at 1201, 1207. The appellants' suggestion that the term "cost" has an equally familiar meaning—a meaning that includes principal payments on capital assets as a component of "cost"—flies in the teeth of our unequivocal holding that "cost," as that term is used in the Act, does not have *any* readily apparent meaning. *See Strickland I*, 48 F.3d at 19.

unconvinced. Statutory ambiguity does not flash on and off like a bank of strobe lights at a discotheque, shining brightly at the time of one lawsuit and then vanishing mysteriously in the interlude before the next suit appears.

We need not dawdle. There is nothing in the record before us to indicate that Congress ever had an unambiguously expressed intent to include principal payments on capital assets as a cost of producing self-employment income. The text of the statute does not encourage such a construction and there is no legislative history (beyond that already considered and deemed insufficient in *Strickland I*, 48 F.3d at 19–20) that supports including principal payments or any proxy therefor as a "cost." To the precise contrary, all the extrinsic evidence suggests that Congress concurred in the Secretary's longstanding decision to disregard such payments. The most persuasive datum comes from the archives of the Program. The Secretary had been excluding principal payments from the cost of producing self-employment income for several years by the time Congress enacted 7 U.S.C. § 2014(d)(9). That being so, the presumption is that Congress intended the word "cost" to be given the same meaning that already had been established in the regulatory context. *See Commissioner v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 159, 113 S.Ct. 2006, 2011, 124 L.Ed.2d 71 (1993); *Strickland I*, 48 F.3d at 20.

■ Here, moreover, it cannot plausibly be argued that Congress merely overlooked the Secretary's contemporaneous treatment of principal payments, for the House Committee on Agriculture explicitly recognized the prevailing practice. *See* H. Rep. No. 464, *supra*, 1977 U.S.C.C.A.N. at 2001–02. This combination—congressional awareness of an existing administrative praxis coupled with a concomitant unwillingness to revise that praxis—strongly implies legislative approval. "[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'" *CFTC v. Schor*, 478 U.S. 833, 846, 106 S.Ct. 3245, 3254, 92 L.Ed.2d 675 (1986) (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1761–62, 40 L.Ed.2d 134 (1974) (footnotes omitted)).[5]

In sum, because Congress has not plainly resolved the interpretive question that is now before us, we must move to the second step of the *Chevron* pavane.

**B**

■ During the second stage of a *Chevron* analysis, an inquiring court accords substantial respect to authoritative agency interpretations. *See Strickland I*, 48 F.3d at 17–18. Thus, an interpretive regulation must be honored unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782. In deciding this issue, a court must avoid inserting its own policy considerations into the mix. "The agency need not write a rule that serves the statute in the best or most logical manner; it need only write a rule that flows rationally from a permissible construction of the statute." *Strickland I*, 48 F.3d at 17; *accord Cohen v. Brown Univ.*, 991 F.2d 888, 899 (1st Cir.1993). Though the level of respect varies with the circumstances, deference to an agency's interpretation is "particularly appropriate in complex and highly specialized areas where the regulatory net has been intricately woven." *Massachusetts Dept. of Educ. v. United States Dept. of Educ.*, 837 F.2d 536, 541 (1st

5. We dismiss out of hand the appellants' contention that *Strickland I* etched in stone a particular conception of "cost," equating the word with cash outlays. This contention reflects a misunderstanding of the thrust of our opinion. The first step of a *Chevron* inquiry requires a court to determine whether the language of a statute is susceptible to more than one natural meaning. Finding "cost" to be inherently ambiguous in the context of the Act, we held that plain meaning did not foreclose the Secretary's decision to exclude depreciation from the cost of producing self-employment income. *See Strickland I*, 48 F.3d at 19. Our intention was to explain why the courts must defer to *any* permissible interpretation of "cost" adopted by the Secretary, not to endorse a particular conception of "cost" (whether it be that of an economist, a layman, or a food stamp recipient).

Cir.1988) (quoting *Citizens Sav. Bank v. Bell,* 605 F.Supp. 1033, 1041 (D.R.I.1985)). Moreover, longstanding agency interpretations generally receive greater deference than newly contrived ones. *See Visiting Nurse Ass'n of No. Shore, Inc. v. Bullen,* 93 F.3d 997, 1008 (1st Cir.1996) .

Applying these standards, we readily conclude that 7 C.F.R. § 273.11(a)(4)(ii) is within the pale. The regulation, which reflects the agency's consistent interpretation for the past quarter-century, emanates from the Secretary's reasonable determination that the purpose of the Act is to help low-income families purchase food, not to underwrite the acquisition of capital assets.[6] To be sure, rental payments on capital assets are, as the appellants point out, deductible as a "cost," but such payments easily can be distinguished from principal payments. When one leases a capital asset (say, a tractor) no ownership interest is acquired, and the lease payments go entirely toward producing self-employment income. By contrast, when one buys a capital asset and pays for it in installments, the payments not only permit the payer to use the asset as a means of producing self-employment income but also permit him to build equity. This additional feature changes the nature of the transaction. The Secretary's regulation reasonably seeks to avoid subsidizing such "dual purpose" payments.

Of course, the appellants now put a different spin on the situation. *See supra* note 2. They suggest that, instead of appraising the validity of 7 C.F.R. § 273.11(a)(4)(ii)(A), we should view the matter in broader terms and determine whether the Secretary must allow *some* offset for expenses associated with the acquisition and depletion of capital assets used in a trade or business.

Passing potential procedural problems and addressing this argument on the merits, it does not benefit the appellants. Their premise is that, by putting capital assets to one side, the Secretary has defined "cost of pro-

ducing self-employment income" so grudgingly as to frustrate Congress' intent. But this premise is faulty. The Secretary has not ignored the costs of doing business; rather, he has recognized numerous items as allowable costs, e.g., labor, stock, inventory, business-related interest (including interest associated with installment payments on capital assets), and taxes paid on income-producing property. *See* 7 C.F.R. § 273.11(a)(4)(i). He simply has refused to recognize the kind of costs for which the appellants seek credit, saying in effect that when a self-employed person is building equity (a phenomenon that almost invariably accompanies the purchase of capital assets), the Secretary will define "cost" very restrictively (probably because no good way exists to give a credit for expenses related to the purchase of capital assets without also subsidizing some intangible ownership interest). As a result, food stamp recipients who buy capital assets are able to claim relatively few offsets for the expense connected with acquiring and using those assets.

We frankly acknowledge that the Secretary's interpretation is a harsh one, especially as it relates to persons in the appellants' position. The regulatory edifice that now exists may not be the one which we, if building on an empty site, would choose to construct. But that is largely beside the point. The term "cost" is ambiguous, and a harsh interpretation, as here, which arises out of the Secretary's reasonable refusal to subsidize ownership, is not *per se* arbitrary or capricious.

## V. CONCLUSION

We need go no further. The "cost of producing self-employment income," 7 U.S.C. § 2014(u,(9), is imprecise and Congress has neither specified that payments designed to amortize the purchase price of capital assets must be deemed part of the cost nor decreed that some equivalent write-off must be recognized in calculating the cost. Thus, the regu-

---

**6.** Our determination that the Secretary reasonably excluded principal payments on capital assets from the cost of producing self-employment income is bolstered by the evidence, already chronicled, that this interpretation of "cost" is very likely the one that Congress intended. *See supra* p. 547. When an agency's interpretation jibes with discernible congressional intent, a court is hard-pressed to declare that interpretation impermissible under *Chevron*'s second step.

lation here at issue represents a permissible construction of the statute. After all, within the wide limits that *Chevron* sets, courts must respect the Secretary's policy choices.

*Affirmed.*